## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

       Plaintiff/Respondent,

       v.

KYLE LUNNIN,

       Defendant/Petitioner.

Case No. 13-40039-07-JAR
Case No. 16-4135-JAR

## MEMORANDUM AND ORDER

This matter is before the Court on Petitioner Kyle Lunnin's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (Doc. 272) and his Memorandum of Law in support (Doc. 276). The Government has responded (Doc. 286), and Petitioner has requested appointment of counsel (Doc. 287). For the reasons explained below, Petitioner's motions are denied without an evidentiary hearing.

## I.      Facts of the Case and Trial Proceedings

On May 1, 2013, Petitioner Kyle Lunnin was charged, along with Shawn Smith, Carlos Espinoza, David Clovis, Blaine Smith, Alex Garay, and Dustin Lunnin (Petitioner's brother), with conspiring to distribute and possess with intent to distribute in excess of 500 grams of a mixture and substance containing a detectable amount of methamphetamine and approximately 68 kilograms of marijuana, in violation of 18 U.S.C. § 846.[1] On October 23, 2013, a First Superseding Indictment was returned against Lunnin, adding one count of witness tampering in violation of 18 U.S.C. § 1512(a)(2)(A), charging Lunnin with using the threat of physical force against prospective witness Ray Hinderliter with the intent to influence, delay, or prevent

---

[1]Doc. 1.

Hinterliter's testimony at the trial against Lunnin on the drug conspiracy charge.[2]  Lunnin was represented throughout pretrial, trial, and sentencing by trial counsel Forrest Lowry.

## A.  The Pretrial *James* Hearing

This Court held a pretrial hearing pursuant to *United States v. James*,[3] to determine the admissibility of certain co-conspirator statements, including statements made during prison calls and visits that the Government intended to introduce at trial, pursuant to Fed. R. Evid. 801(d)(2)(E).[4]  The Government called four cooperating witnesses:  David Clovis, Hinderliter, Blaine Smith, and Alexander Garay.  The witnesses testified regarding their roles in the distribution of methamphetamine and/or marijuana in the Salina, Kansas area from February 2012 through January 2013.[5]  The witnesses described Shawn Smith as the leader of the drug distribution operation.[6]  The Government provided the Court with a digital copy of the recorded jail calls and visits it sought to introduce at trial.[7]

At the conclusion of the hearing, the Court found that the statements that the four witnesses testified to were made to them by alleged co-conspirators during the course of and in furtherance of the alleged conspiracy were admissible under Rule 801(d)(2)(E).[8]  After reviewing the recorded jail calls and visits, the Court ruled before trial started that the statements on the recordings were also admissible under Rule 801(d)(2)(E).[9]

---

[2]Doc. 111.

[3]590 F.2d 575 (5th Cir. 1979).

[4]Doc. 248, Mtn. Hr'g. Tr.

[5]*Id.*

[6]Id.

[7]*Id.* at 177.

[8]*Id.* at 182–83.

[9]*Id.* at 186–90; Docs. 249, Trial Tr. at 3–4.

**B. The Trial**

**1. Narcotics Conspiracy Count**

Lunnin's trial began on January 7, 2014.[10]The Government presented testimony from numerous witnesses, including four of Lunnin's alleged co-conspirators: Blaine Smith, Alex Garay, David Clovis, and Ray Hinderliter.[11] This evidence established that Shawn Smith operated a methamphetamine and marijuana distribution business based in Salina, Kansas, with members in Kansas, Colorado and elsewhere.

*Blaine Smith Testimony*

Shawn Smith, who had been released from prison in February 2012, had sources of supply in Colorado for methamphetamine and marijuana.[12] Smith and his son, Blaine, as well as other co-conspirators, traveled to Colorado on behalf of the organization to pick up methamphetamine and marijuana, which was then distributed to local dealers in Salina for resale. Some of the dealers included Blaine Smith, Garay, Hinderliter, and Petitioner's brother, Dustin Lunnin, also known as "Red."[13] Between February 2012 and January 2013, Shawn Smith's organization distributed approximately 50 pounds of methamphetamine and more than 150 pounds of marijuana.[14]

The drug purchases were financed, in part, by investors who pooled their money so that Shawn Smith and his associates could purchase several pounds of methamphetamine and marijuana at a time from the Colorado sources. Co-defendant Carlos Espinoza was in charge of

---

[10]Docs. 249–52, Trial Tr.

[11]Trial Tr. 82–110, 127–59, 160–83, 189–213.

[12]*Id.* at 87–92.

[13]*Id.* at 87–100, 106, 131, 135.

[14]*Id.* at 87, 166, 194–95, 329–30.

collecting money from investors and local dealers.[15]  Lunnin invested $5000 and expected to make $7500 from the sale of the narcotics.[16]

Shawn Smith was arrested on December 3, 2012, the day after he and Garay returned from Colorado with several pounds of marijuana.  After Shawn Smith's arrest, members of the organization continued to travel to Colorado to pick up drugs for distribution and to collect money owed or to be used for more drug loads.[17]

### *Hinderliter's Testimony*

Hinderliter testified that he is a tattoo artist, and that Shawn Smith went to him for tattoo work.  At some point between August and October 2012, Hinderliter began to purchase methamphetamine from Shawn Smith on a regular basis, and distributed the methamphetamine to others for resale.[18]  He estimated that he typically purchased two ounces of methamphetamine two times per week from Shawn Smith for $1000 per ounce.[19]

Shawn Smith told Hinderliter he was getting the methamphetamine from Colorado. Hinderliter frequently picked up his share of methamphetamine from Espinoza at Smith's residence and Espinoza picked up money from Hinderliter for the drugs.[20]  Blaine Smith also picked up money from Hinderliter for his father, and Garay sometimes delivered methamphetamine to Hinderliter and picked up money from him for Shawn Smith.[21]

---

[15]*Id.* at 94, 179.

[16]*Id.* at 102.

[17]*Id.* at 150–53.

[18]*Id.* at 194.

[19]*Id.* at 195.

[20]*Id.* at 197–98.

[21]*Id.* at 199.

Hinderliter had limited contact with Lunnin, but on one occasion, Lunnin picked up money from Hinderliter for Shawn Smith that was for the purchase of drugs.[22]  Lunnin also paid Hinderliter with methamphetamine for a tattoo.  Dustin Lunnin delivered methamphetamine to Hinderliter from Shawn Smith approximately five times.[23]

Hinderliter testified that on one occasion in 2012, while he was tattooing Shawn Smith at Hinderliter's home, various people came to the house to deliver money to Smith.[24]  By the end of the day, Shawn Smith had "a large amount of money," some wrapped in rubber bands, in a plastic Tupperware container.[25]  Lunnin and his brother, arrived at Hiderliter's tattoo room, sat on the floor, and began to count the money.[26]  The men divided the different denominations into separate piles, stacked them up, weighed the stacks of money, made a notation, and placed the money back into the Tupperware container.[27]  On cross-examination, Hinderliter testified that he thought he told his case agent, Investigator Rupert, about Lunnin's participation in the money counting during a debriefing session in January 2013, and he was certain he told Investigator Rupert about the incident at a December 2013 debriefing.[28]

After Shawn Smith's arrest on December 3, 2012, Hinderliter visited him at the Saline County jail.  Smith told Hinderliter that the organization needed somebody to travel to Colorado to obtain more drugs.[29]

---

[22]*Id.* at 200–01.

[23]*Id.* at 202.

[24]*Id.* at 202–03.

[25]*Id.* at 203–04.

[26]*Id.* at 203.

[27]*Id.* at 203–04.

[28]*Id.* at 235–37.

[29]*Id.* at 206–07.

Hinderliter was arrested on January 17, 2013, and agreed to cooperate with the Government.[30] He agreed to record a face-to-face meeting with Espinoza, who told him no more trips were planned to Colorado because "things were hot" and "everything had been shut down."[31]

### *Corroborating Evidence*

Shawn Smith continued to operate his drug business from jail after his arrest. The Government introduced several recorded jail calls between Smith and his co-conspirators. During a December 15, 2012 call, Shawn Smith directed Espinoza to "get ahold of Kyle to get things going, to get things set back up with Scheme."[32] Investigator Rupert testified that "Scheme" was Shawn Smith's source of supply for methamphetamine, based in Denver.[33]

On January 2, 2013, Lunnin visited Shawn Smith in jail.[34] That meeting was recorded and played for the jury. Investigator Rupert explained that during the meeting, Lunnin and Shawn Smith discussed Lunnin's $5000 investment, which was supposed to yield $7500 within seven days.[35] Smith assured Lunnin that "the product is already out there, it's already made its money," and that Lunnin would get his money.[36]

In a January 3, 2013 call, Shawn Smith told Dustin Lunnin to get together with his brother (Petitioner) and a female individual to plan some more trips to Colorado.[37]

---

[30]*Id.* at 207.

[31]*Id.* at 208–09.

[32]Trial Ex. 3-G.

[33]Trial Tr. at 297.

[34]*Id.* at 309; Trial Ex. 3-R.

[35]Trial Tr. at 310.

[36]Id.

[37]*Id.* at 311–12; Trial Ex. 3-S.

On February 11, 2013, Investigator Rupert and others arrested Espinoza.[38]  Officers recovered an iPad incident to his arrest, which contained text messages, Espinoza's notes, and an "owe sheet," reflecting who he distributed drugs to and how much they owed him.[39]  Among these notes were two references to Lunnin:  (1) "Kyle paid $5 paid 1"; and (2) "Red $6 pay Kyle $4 n me $2."[40]  Investigator Rupert testified that "$5" referred to $5000 that Petitioner invested with Shawn Smith, and that the "$6" and "$4" referred to $6000 and $4000, respectively.[41]

Inside Shawn Smith's cell at the Saline County jail, officers found two sheets of paper and the cardboard back of a notebook that contained handwritten notes, including names, numbers, and drug types.[42]  The notes on the cardboard listed Smith's main suppliers for methamphetamine and marijuana and the local distributors who received the drugs via Smith.[43]  The notes included a reference to Lunnin: "Rich San Fran, Kyle Red 4 pounds."[44]  Based on his participation in the investigation, Investigator Rupert was aware that "Rich" was from San Francisco and supplied marijuana.[45]

## 2.  Witness Tampering Count

Hinderliter testified that on August 29, 2013, he was at the Department of Children and Families ("SRS") in Salina with his wife.[46]  While Hinderliter was seated in the waiting area,

---

[38]Trial Tr. at 322–23.

[39]*Id.* at 328.

[40]*Id.* at 326, 342.

[41]Id.

[42]*Id.* at 331–35.

[43]*Id.* at 336.

[44]*Id.* at 335, 337.

[45]*Id.* at 337.

[46]*Id.* at 211–12.

Lunnin entered the room.[47]  When he saw Hiderliter, Lunnin said: "You fucking pussy, you're the feds and you're going to die," "I'll kill you," and "Watch, watch, watch."[48]  Lunnin was less than ten feet away from Hinderliter when he made these threats.[49]  Hinderliter called 911 and reported the incident to the police.[50]

Bobbi Moore was in the SRS waiting room on August 29, 2013, sitting near Hinderliter, when Lunnin entered the room.[51]  Moore testified that when Lunnin saw Hinderliter, he appeared to recognize him and "started calling him names."[52]  Moore testified that "[h]e pretty much said that he knew what was up.  Called him a pussy ass bitch.  Told him he was the feds and that he would fucking kill him."[53]  The incident lasted approximately five seconds before Lunnin left the SRS office.[54]  Moore did not know Hinderliter, and testified that he looked like he was "kind of in shock . . . [a] little embarrassed."[55]  Ten to fifteen minutes later, a police officer arrived at the SRS office and spoke to Hinderliter.[56]  Because SRS staff was questioning Hinderliter's account, Moore spoke up and told the officer that Hinderliter had in fact been threatened.[57]

---

[47]Id.

[48]*Id.* at 212.

[49]Id.

[50]*Id.* at 213.

[51]*Id.* at 65.

[52]*Id.* at 66.

[53]*Id.* at 67.

[54]*Id.* at 68, 71.

[55]*Id.* at 68.

[56]*Id.* at 69.

[57]Id.

The Government played a videotape for the jury, obtained from the SRS office, which depicted the August 29, 2013 encounter between Lunnin and Hinderliter.[58]  The security footage did not contain audio.

## C.  Verdict

On January 10, 2014, the jury returned guilty verdicts on both counts.[59]  In response to special interrogatories, the jury found that the Government proved beyond a reasonable doubt that Lunnin "conspired to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine," and that Lunnin "conspired to distribute 50 kilograms or more of marijuana."[60]

## D.  Sentencing

The Presentence Investigation Report ("PSR") reported that Lunnin was accountable for the marijuana equivalent of 1050 kilograms of marijuana, which was based on the jury's special findings.[61]  This resulted in a base offense level of 32.[62]  The PSR added two levels for obstruction of justice and three levels for committing the offense while on release, for a total offense level of 37.[63]  Based on a total offense level of 37 and a criminal history category of I, the advisory Guidelines range was 210 to 262 months.[64]

Lunnin objected to "the inclusion of excess drug amounts contained in paragraph 37 of the [PSR]," which reported that Smith told law enforcement officers that Lunnin gave him a total

---

[58]*Id.* at 356–57.

[59]Doc. 172.

[60]Id.

[61]Doc. 215, PSR ¶¶ 61–62.

[62]*Id.* ¶ 70.

[63]*Id.* ¶¶ 74–75, 79.

[64]*Id.* ¶ 112.

of $22,500 to purchase drugs, in exchange for a profit of $10,000.[65]  Lunnin argued that, notwithstanding the jury's special findings, he should be held accountable for 177.2 grams of methamphetamine, corresponding to the $5000 loan he made to Smith.[66]  Lunnin also requested a four-level reduction for being a minimal participant in the offense and objected to the enhancements for obstruction of justice and commission of the offense while on release.[67]

Lunnin requested a downward departure from the Guidelines to offense level 32, which would allow this Court to impose a sentence of 121 months.[68]  This request was based on a number of factors, including Lunnin's health and sentencing disparity.[69]

At the sentencing hearing held May 27, 2014, this Court denied Lunnin's objection to Paragraph 37 of the PSR, noting that that $22,500 was irrelevant to the relevant conduct calculation and did not affect the overall Guidelines calculation.[70]  The Court also denied Lunnin's request for a minimal role reduction, concluding that he did not qualify under the Guidelines because he was only held responsible for conduct that was attributed directly to him.[71]  The Court also denied Lunnin's request for a downward departure based on sentencing disparity, finding his choices and actions resulted in enhancements and the loss of reductions under the Guidelines.[72]  The Court granted a two-level departure in anticipation of the Smart Sentencing Act.

---

[65]Doc. 219, Sent. Mem. at 3.

[66]Id.

[67]*Id.* 3–5.

[68]*Id.* 3, 6.

[69]*Id.* 6.

[70]Doc. 253, Sent. Hrg. Tr. at 8.

[71]*Id.* at 8–9.

[72]*Id.* at 9–10.

The Court imposed a sentence of 144 months' imprisonment on each count, to run concurrently, plus 24 months' imprisonment pursuant to 18 U.S.C. § 3147, to run consecutively, for a total term of imprisonment of 168 months.[73]

### E. Direct Appeal

Lunnin filed a direct appeal, raising the following issues: 1) sufficiency of the evidence as to Count One, the drug conspiracy; 2) whether this Court erred in admitting co-conspirator statements pursuant to Fed. R. Evid. 801(d)(2)(D); 3) whether the Government knowingly offered perjured testimony through witness Hinderliter; 4) sufficiency of the evidence as to Count Two, witness tampering; 5) cumulative error; 6) whether this Court erred in denying his request for a minimal role reduction; and 7) whether his sentence was substantively unreasonable.[74] Lunnin was represented on appeal by appellate counsel Christopher P. Keleher. On May 29, 2015, the Tenth Circuit Court of Appeals rejected all of Lunnin's claims and affirmed his conviction and sentence.[75]

This timely § 2255 motion followed.[76] Lunnin claims that he was denied effective assistance of counsel at all stages of his criminal proceedings. In response, the Government submits the affidavit of Lunnin's trial counsel, Forrest Lowry.[77]

---

[73]*Id.* at 15; Doc. 222, Judgment.

[74]*United States v. Lunnin*, 608 F. App'x 649 (10th Cir. 2015).

[75]See id.

[76]Doc. 286, Ex. A.

[77]Id.

## II.     Legal Standard

Section 2255 entitles a federal prisoner to relief "[i]f the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or [is] otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack."[78] The court must hold an evidentiary hearing on a § 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."[79]  A § 2255 petitioner must allege facts that, if proven, would warrant relief from his conviction or sentence.[80]  An evidentiary hearing is not necessary where the factual allegations are contradicted by the record, inherently incredible, or when they are conclusion rather than statements of fact.[81]

The Sixth Amendment guarantees that "[i]n all criminal prosecution, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."[82]  A successful claim of ineffective assistance of counsel must meet the two-pronged test set forth in *Strickland v. Washington*.[83]  First, a defendant must show that his counsel's performance was deficient in that it "fell below an objective standard of reasonableness."[84]  To meet this first prong, a defendant must demonstrate that the omissions of his counsel fell "outside the wide range of professionally

---

[78]28 U.S.C. § 2255(b).

[79]*United States v. Galloway*, 56 F.3d 1239, 1240 n.1 (10th Cir. 1995) (quoting 28 U.S.C. § 2255(b)).

[80]*In re Lindsey*, 582 F.3d 1173, 1175 (10th Cir. 2009).

[81]*See Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir. 1995), *cert. denied*, 517 U.S. 1235 (1996) ("[t]he allegations must be specific and particularized, not general or conclusory"); *United States v. Fisher*, 38 F.3d 1143, 1147 (10th Cir. 1994) (rejecting ineffective assistance of counsel claims that are merely conclusory in nature and without supporting factual averments).

[82]U.S. Const. amend. VI; *see Kansas v. Ventris*, 556 U.S. 586 (2009).

[83]466 U.S. 668 (1984).

[84]*Id.* at 688.

competent assistance."[85]  This standard is "highly demanding."[86]  Strategic or tactical decisions on the part of counsel are presumed correct, unless they were "completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible defense strategy."[87]  In all events, judicial scrutiny of the adequacy of attorney performance must be strongly deferential: "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[88]  Moreover, the reasonableness of the challenged conduct must be evaluated from counsel's perspective at the time of the alleged error, and "every effort should be made to 'eliminate the distorting effects of hindsight.'"[89]

Second, a defendant must also show that his counsel's deficient performance actually prejudiced his defense.[90]  To prevail on this prong, a defendant "must show there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different."[91]  A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome."[92]  This, in turn, requires the court to focus on "the question whether counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair."[93]

---

[85]*Id.* at 690.

[86]*Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

[87]*Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) (quotation and citations omitted).

[88]*Strickland*, 466 U.S. at 687.

[89]*Edens v. Hannigan*, 87 F.3d 1109, 1114 (10th Cir. 1996) (quoting *Strickland*, 466 U.S. at 689).

[90]*Strickland*, 466 U.S. at 687.

[91]*Id.* at 694.

[92]*Id.*

[93]*Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

A defendant is entitled to the effective assistance of counsel during plea negotiations.[94] "The performance prong of *Strickland* requires a defendant to show that counsel's representation fell below an objective standard of reasonableness."[95] To determine prejudice in this context, a defendant "must show the outcome of the plea process would have been different with competent advice."[96] Where a defendant rejects a plea offer and proceeds to trial, he

> must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court . . . , that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that were in fact imposed.[97]

Claims of ineffective assistance of appellate counsel are also governed by *Strickland's* standards.[98] "When considering a claim of ineffective assistance of appellate counsel for failure to raise an issue, we look to the merits of the omitted issue."[99] If the omitted issue has no merit, counsel's failure to raise it does not constitute ineffective assistance of counsel.[100]

In all events, a defendant must demonstrate both *Strickland* prongs to establish a claim of ineffective assistance of counsel, and a failure to prove either one is dispositive.[101] "The performance component need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'"[102]

---

[94]*Lafler v. Cooper,* 566 U.S. 156, 162–63 (2012).

[95]*Id.* at 163 (internal quotation marks omitted).

[96]*Id.*

[97]*Id.* at 164.

[98]*See Hooks v. Ward*, 184 F.3d 1206, 1221 (10th Cir. 1999).

[99]Id.

[100]*Id.*

[101]*Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

[102]*Id.* (quoting *Strickland*, 466 U.S. at 697); *see also Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001) ("This court can affirm the denial of habeas relief on whichever *Strickland* prong is the easier to resolve.").

III.     **Discussion**

    **A.  Plea Bargaining Process**

Lunnin claims that he would have accepted the Government's first plea offer—guilty pleas to four counts of aiding and abetting the distribution of methamphetamine in lieu of the conspiracy charge—had Lowry accurately explained the consequences of pleading guilty versus going to trial.  Lunnin alleges that Lowry "guarantee[d] him a sentence after trial of ten years or less, based on minimal role and safety-valve reductions."[103]  He further claims that Lowry told him there was "no evidence" to support the conspiracy charge against Lunnin and that the witness tampering charge the Government might add to the indictment would be "hard for the government to prove."[104]

Lunnin cannot establish that Lowry's performance fell below an objective standard of reasonableness or that he would have accepted the plea offer but for Lowry's ineffective advice. In his affidavit, Lowry states that he conducted plea negotiations with AUSA Hendershot at different times before trial.[105]  AUSA Hendershot emailed a plea offer to Lowry on September 9, 2013, that would have resulted in a five-year, rather than ten-year, mandatory minimum sentence, and dismiss the witness tampering charge.  Lowry discussed the Government's September 9, 2013 plea offer in person with Lunnin.[106]  He explained to Lunnin the potential mandatory minimum penalties and the operation of the Guidelines in Lunnin's case, and "feel[s] certain" that he recommended that Lunnin accept the offer.[107]  Although he believed Lunnin should have received points off for his minimal role in the offense, he did not offer any

---

[103]Doc. 276 at 5–6.

[104]*Id.* at 4.

[105]Doc. 286, Ex. A at 3.

[106]*Id.* ¶ 5.

[107]*Id.* ¶ 4.

guarantees of such an outcome, nor did he guarantee that Lunnin would not receive a sentence of more than ten years if he went to trial.[108] Lunnin "consistently informed [Lowry] that he was not interested in the offer because he wasn't a part of any conspiracy."[109] In fact, Lunnin continues to assert that he is "actually and factually innocent" of both charges against him.

Lunnin also claims that he rejected the Government's second plea offer to plead guilty to the drug conspiracy charge, because Lowry advised him there was "no evidence" to support Lunnin's participation in the charged conspiracy. In his affidavit, however, Lowry explains that he told Lunnin that the Government's evidence on the conspiracy charge was "not overly strong," but cautioned that the jury might disagree once it heard all the evidence.[110] Lowry goes on to explain that Lunnin insisted "he wasn't part of any conspiracy."[111] Lunnin does not explain how counsel could have been derelict in his advice during plea negotiations while he simultaneously maintains his innocence on all charges. Instead, Lunnin's statements belie his claim, and reveal that he rejected the second plea offer because he maintained he was innocent of the conspiracy charge.

Nor did Lowry provide Lunnin with objectively unreasonable advice concerning the witness tampering charge. In his affidavit, Lowry states he did not advise Lunnin that the charge would be hard to prove because Hinderliter was not on the witness list at the time of the incident. Instead, that was an argument Lunnin insisted upon making and that Lowry repeatedly discouraged him from using.[112] Accordingly, the Court finds that Lowry did not provide Lunnin with ineffective advice during the plea bargaining process, and this claim is denied.

---

[108] *Id.* ¶¶ 4, 6.

[109] *Id.* ¶ 4.

[110] Id.

[111] Id.

[112] *Id.* ¶ 8.

## B. *James* Hearing

Lunnin argues that counsel was ineffective for failing to request a severance at the *James* hearing, given that the Court granted his unopposed motion to sever his trial pursuant to Fed. R. Crim. P. 14(a).[113]

The Court held a *James* hearing on January 6, 2014.[114] Co-defendant Dustin Lunnin participated in the hearing. After hearing testimony from four cooperating witnesses, the Court denied defendants' motions to exclude co-conspirator statements, finding all of the statements made to them by alleged co-conspirators were admissible pursuant to Fed. R. Evid. 801(d)(2).[115] The Court further ruled that recorded jailhouse calls and visits also were admissible.[116]

Co-conspirator statements are properly admitted into evidence pursuant to Rule 801(d)(2)(E) if by a preponderance of the evidence, the trial court finds that 1) a conspiracy existed; 2) both the declarant and the defendant against whom the declaration is offered were members of the conspiracy; and 3) the statement was made in furtherance of the conspiracy.[117] Under Tenth Circuit law, the district court may satisfy the prerequisite for admission of co-conspirator statements by holding a *James* hearing or by provisionally admitting the statements with the caveat that the government prove the existence of the conspiracy through testimony or other evidence.[118] The preferred order of proof is first for the district court to hold a *James* hearing "outside the presence of the jury to determine by a preponderance of the evidence the

---

[113]Doc. 85.

[114]Doc. 248, Motion Hrg. Tr.

[115]*Id.* at 179–85.

[116]*Id.* at 186–90.

[117]*United States v. Johnson,* 911 F.2d 1394, 1403 (10th Cir. 1990).

[118]*United States v. Owens,* 70 F.3d 1118, 1123 (10th Cir. 1995).

existence of a predicate conspiracy."[119]  At a *James* hearing, the court may consider the hearsay statements sought to be admitted as well as independent evidence when making the requisite findings.[120]  The court has the discretion to consider any hearsay evidence not subject to privilege, regardless of whether or not that evidence would be admissible at trial.

The Court agrees that there was no basis for Lowry to request that Lunnin be severed from Dustin Lunnin for purposes of the *James* hearing, which was held before this Court, not before a jury.  Lunnin points to no case law or authority to support his position.  In fact, given that severance of co-defendants for trial purposes is disfavored in conspiracy cases, the likelihood that the Court would have granted any such request at the *James* hearing is unlikely.[121]  This claim is denied.

### C.  Motion to Dismiss for a Bill of Particulars

Lunnin claims that counsel was ineffective for failing to file a motion to dismiss the drug conspiracy count for insufficient evidence or, in the alternative, a motion for a bill of particulars after the conclusion of the *James* hearing.  Lunnin argues that because this Court found at the conclusion of the hearing, that "[i]t appeared that Kyle Lunnin was involved only in methamphetamine[,]" counsel should have filed a motion pursuant to Fed. R. Crim. P. 12 for dismissal of the indictment without prejudice, given that Count One also charged a marijuana conspiracy.  This argument is without merit.

First, Count One charged Lunnin with conspiracy to distribute and possess with intent to distribute both methamphetamine and marijuana.  It is well-settled that an offense may be

---

[119]*United States v. Lopez-Gutierrez,* 83 F.3d 1235, 1242 (10th Cir. 1996) (citing *United States v. Urena,* 27 F.3d 1487, 1491 (10th Cir. 1994)).

[120]*Bourjaily v. United States,* 483 U.S. 171, 179 (1987); *Johnson,* 911 F.2d at 1403.

[121]*See United States v. Wright,* 932 F.2d 868, 876 (10th Cir. 1991) (explaining the Tenth Circuit follows the general rule that individuals charged together should be tried together).

alleged in the indictment in the conjunctive, but thereafter proven in the disjunctive.[122]  The

Government could have proceeded at trial against Lunnin on both controlled substances, or only

on one.  Lunnin does not dispute that the Government presented evidence at the *James* hearing

that he was involved in a methamphetamine distribution conspiracy.  Moreover, not all of the

Government's evidence is necessarily presented at a *James* hearing, which focuses on the

admissibility of co-conspirator statements.  Thus, counsel's failure to move to dismiss the

indictment after the *James* hearing did not fall below an objective standard of reasonableness.

Likewise, counsel was not ineffective for failing to move for a bill of particulars

concerning Lunnin's participation in a marijuana distribution conspiracy.  "The purpose of a bill

of particulars is to inform the defendant of the charge against him with sufficient precision to

allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double

jeopardy in the event of a later prosecution for the same offense."[123]  The sufficiency of an

indictment is generally held to minimal constitutional standards and is "judged by practical

rather than technical considerations."[124]  It is generally sufficient if it tracks the statute when the

statute lists all the elements of the offense.[125]  Here, because Count One adequately tracked the

language of 18 U.S.C. § 846 and included the dates of the alleged illegal activity, the place, and

the specified controlled substances at issue, a bill of particulars was not warranted.

Nor does Lunnin meet his burden to show prejudice.  Lunnin fails to show that, had

counsel filed a motion to dismiss the indictment, the Court would have granted that motion or

---

[122]*United States v. McGehee,* 177 F. App'x 815 (10th Cir. 2006), *cert. denied,* 549 U.S. 1317 (2007).

[123]*United States v. Dunn,* 841 F.2d 1025, 1029 (10th Cir. 1988) (quoting *United States v. Cole,* 755 F.2d 748, 760 (11th Cir. 1985)).

[124]*United States v. Edmonson,* 962 F.2d 1535, 1541 (10th Cir. 1992).

[125]*Dunn,* 841 F.2d at 1029.

that a likelihood of a different result at trial was substantial.[126]  In fact, the jury found that Lunnin

conspired to distribute 50 kilograms or more of marijuana, which belies his argument that there

was no evidence he was involved in a conspiracy to distribute marijuana.  Further, at the

conclusion of the *James* hearing, this Court denied co-defendant Dustin Lunnin's motion for a

bill of particulars regarding the conspiracy charge, noting that it is not intended to be a discovery

device.[127]  Lunnin's claim on this ground is denied.

### D.  Motion to Dismiss Based on Death of Shawn Smith

Lunnin claims that counsel was ineffective for failing to file a motion to dismiss the

indictment after co-defendant Shawn Smith died.  Lunnin argues that because Lowry refused to

file the motion, he filed it *pro se*, alleging a confrontation clause violation.  Lunnin asserts that

this Court denied his *pro se* motion because "Lunnin could not file motions while represented by

counsel."[128]  Although representation by counsel is sufficient grounds for dismissal of a *pro se*

motion, this Court also reviewed his motion to dismiss and found it to be without merit, with no

grounds for dismissal articulated in the motion.[129]  Because Lunnin urges that counsel should

have filed a motion to dismiss based on the same grounds, his claim of ineffective assistance has

no merit, as he cannot show he suffered prejudice.[130]

### E.  Motion to Strike Surplusage

Lunnin claims counsel provided ineffective assistance by failing to move to strike

language in Count Two, the witness tampering count.  Count Two described the "official

proceeding" in more detail as "the trial of Kyle Lunnin on the conspiracy charge in United States

---

[126]*Harrington v. Richter,* 562 U.S. 86, 112 (2011).

[127]Docs. 126, 248 at 191–92.

[128]Doc. 276 at 11.

[129]Mtn. Hrg. Tr. at 6.

[130]*Strickland,* 466 U.S. at 694.

District Court Case 13-40039."[131] Lunnin argues that this language is surplusage because it "goes beyond the elements of the offense" and that it prejudiced him because "[i]t is impossible to determine if the conviction is based upon the jury's finding that Lunnin's conduct affected an 'official proceeding' or the 'trial of Kyle Lunnin.'"[132] Lunnin's argument is misplaced.

Fed. R. Crim. P. 7(d) allows district courts to "strike surplusage from the indictment or information." A district court has discretion to strike surplusage allegations "not relevant to the charge at issue and inflammatory and prejudicial to the defendant."[133] "However, language in the indictment or information describing the essential elements of the crime alleged is not surplusage and cannot be stricken under Rule 7(d)."[134]

Lunnin was charged in Count Two with violating 18 U.S.C. § 1512(a)(2)(A), which provides: "Whosoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding . . . shall be punished as provided in in paragraph (3)." 18 U.S.C. § 1515(a)(1)(A) defines "official proceeding," as used in sections 1512 and 1513 of the United States Code, as "a proceeding before a judge or court of the United States, a United States Magistrate Judge, . . . or a Federal grand jury[.]" Lunnin's criminal trial before this United States District Court constitutes an "official proceeding," as defined by the statute. The more specific language in Count Two regarding "the trial of Kyle Lunnin" did not "broaden the possible bases" for his section 1512 conviction or add a "defective element." Instead, it explained that the "official proceeding" referred to in Count Two was Kyle Lunnin's trial.

---

[131]Doc. 111, First Superseding Indict. at 2.

[132]Doc. 276 at 13–14.

[133]*United States v. Collins,* 920 F.2d 619, 631 (10th Cir. 1990) (collecting cases).

[134]*Id.*

Accordingly, counsel's failure to move to strike the alleged surplusage in Count Two did not fall below an objective standard of reasonableness.

### F. Cross-Examination of Hinderliter

Lunnin claims that counsel's cross-examination of Government witness Hinderliter was constitutionally deficient. Specifically, Lunnin argues that "[a] carefully crafted cross-examination of Hinderliter would inevitably, even probably, have exposed his credibility (reputation for truthfulness) as a witness and impeached him with inconsistent prior statements."[135] Lunnin takes issue with Lowry's failure to introduce recordings of Hinderliter's interviews with law enforcement and failure to "expose Hinderliter's extensive past criminal history and propensity to embellish the truth."[136]

The Tenth Circuit has held, "the manner in which counsel cross-examines a particular witness is a strategic choice and therefore 'virtually unchallengeable.'"[137] During cross-examination, Lowry challenged Hinderliter's credibility in several ways, including: (1) eliciting that he had been a drug addict for several years, including during his participation in the instant conspiracy to distribute methamphetamine, and that his memory was "foggy" when he used drugs;[138] (2) getting Hinderliter to admit that he first went to prison in 1982 for selling LSD and had been in the penal system for twenty-eight years, mostly spent in jail;[139] (3) eliciting that during Hinderliter's first interview with law enforcement in connection with this case, he did not disclose that he had been selling methamphetamine during the prior six to eight months, and that

---

[135]Doc. 276 at 15.

[136]*Id.* at 16.

[137]*Kessler v. Cline,* 335 F. App'x 768, 770 (10th Cir. 2009) (quoting *Strickland,* 466 U.S. at 690).

[138]Doc. 250, Trial Tr. at 213–23.

[139]*Id.* at 231–33.

he did not make that admission until almost one year later;[140] (4) attempting to raise doubts about Hinderliter's motivation and truthfulness by eliciting that Hinderliter entered into an immunity agreement and therefore was not charged by federal or state authorities, despite his substantial methamphetamine sales;[141] and (5) comparing testimony of Hinderliter to that of Inspector Rupert to show Hinderliter's account differed from Rupert's recollection and reports summarizing the information provided during his debriefing sessions.[142]  Indeed, this last line of questioning was the basis for Lowry's Fed. R. Crim. P. 29 argument that Hinderliter was not credible and fabricated that he saw Lunnin counting money with Shawn Smith and Dustin Lunnin.[143]

While Lunnin argues that Lowry failed to ask "a few more questions," that does not rise to the level of objectively unreasonable performance.  As the Tenth Circuit has noted, "[b]ecause possibilities without proof are endless, they are no measure of counsel's performance."[144] Lunnin fails to meet his burden to show counsel's cross-examination of Hinderliter fell below an objective standard of reasonableness, and this claim is denied.

### G.  Witness Statements/*Jencks* Act

Lunnin claims that counsel was ineffective for failing to timely request *Jencks* Act materials on Hinderliter from the Government.  The *Jencks* Act requires the government to disclose to criminal defendants any statement made by a government witness that is "in the possession of the United States" once that witness has testified.[145]  The purpose of the Act is to

---

[140]*Id.* at 233–34.

[141]Id.

[142]*Id.* at 235–38, 346–49.

[143]Id.

[144]*United States v. Rushin,* 642 F.3d 1299, 1307 (10th Cir. 2011).

[145]18 U.S.C. § 3500(a) & (b).

protect the government's files from unwarranted disclosure and to allow defendants access to materials usable for impeachment purposes.[146]

Lowry states in his affidavit that he had "plenty of *Jencks* material on Ray Hinderliter, and used it in [his] cross-examination at trial."[147]  As Lowry's cross-examination of Hinderliter reflects, counsel had received impeachment materials, including reports of debriefing sessions, and used them to impeach Hinderliter's credibility.  Lunnin offers no factual basis for his claim that Lowry failed to request *Jencks* Act materials.  Accordingly, Lunnin fails to meet his burden to present evidence and facts upon which this Court may conclude that he is entitled to relief, and this claim is denied.[148]

### H.  Failure to Present Factual Innocence/Legal Impossibility Defense

Lunnin claims he is factually innocent of both the drug conspiracy count and the witness tampering count and that Lowry was ineffective in failing to present a legal impossibility defense.  Lunnin argues that the record shows his "involvement in the drug 'conspiracy' consisted of a one-time $5,000 investment with Shawn Smith."[149]  He claims his conspiracy conviction "was a result of evidence that did no more than create suspicion of guilt from piling inference on top of inference[.]"[150]  He goes on to argue that even assuming he made four $5,000 investments in methamphetamine, it still falls short of the quantities charged in the indictment and makes it "legally impossible" for him to have committed the offenses charged in Count One. As to his witness tampering conviction, Lunnin contends he is "actually innocent" because "[a]t

---

[146]*See United States v. Smaldone,* 544 F.2d 456, 460 (10th Cir. 1976).

[147]Doc. 266, Ex. A ¶ 9.

[148]*Strickland,* 466 U.S. at 690 (stating a defendant "must identity the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," and reviewing court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct").

[149]Doc. 276 at 21.

[150]*Id.* at 22.

the time the alleged incident occurred . . . Hinderliter was not involved in nor a witness to Lunnin's official proceedings[.]"[151]  These claims are without merit.

First, the record belies Lunnin's claim that Lowry failed to argue that he was factually innocent of the charged offenses, or that it was legally impossible for him to have committed the offenses.  At the conclusion of the Government's case, Lowry moved for acquittal and argued that the Government failed to prove that Lunnin was a member of a drug conspiracy or that he sold, purchased, or transported any drugs.[152]  Lowry further argued that the Government's only proof was that Lunnin gave a co-defendant $5000 and received nothing in return.[153]  Lowry also argued that "[w]e don't have any evidence that my client had anything to do with drugs other than an occasional user."[154]  Lunnin makes essentially the same arguments in his § 2255 by urging that he is "actually and factually innocent."

Second, with respect to the witness tampering charge, Lowry argued that the video showed that there was no real threat, as the incident lasted "a second and a half," and Hinderliter did not appear to be bothered.[155]  Lowry further argued that there was no evidence that at the time of the incident, Hinderliter was a government witness.[156]  The Court rejected both arguments.[157]

Nor can Lunnin establish that, had Lowry presented these defenses, there is a substantial likelihood that the outcome of the trial would have been different.  The Tenth Circuit rejected Lunnin's claims that the evidence presented at trial was insufficient to establish his convictions

---

[151]*Id.* at 24, 26–27.

[152]Trial Tr. at 362–63.

[153]*Id.* at 363.

[154]Id.

[155]*Id.* at 354–66.

[156]*Id.* at 365–67.

[157]*Id.* at 373.

for conspiring to distribute methamphetamine and marijuana, and for witness tampering.[158]  The

Tenth Circuit also found that the jury's special findings that Lunnin conspired to distribute 500

grams or more of methamphetamine and at least 50 kilograms of marijuana "were adequately

supported by the evidence presented at trial."[159]  Thus, Lunnin fails to show prejudice under

*Strickland*, and this claim is denied.

### I.  Failure to Present Expert Testimony

Lunnin claims that counsel was ineffective in failing to call an expert witness to testify

about drug quantities.  Lunnin contends that "expert testimony concerning drug amounts alleged

in the conspiracy would have impressed upon the jury Lunnin's minimal participation" and

would have resulted in a finding that Lunnin was responsible for a lower quantity of drugs.[160]

This argument is without merit.

First, Lunnin provides no factual basis for his claim, or proffer what the expert's

testimony would have been and how it would have changed the jury's assessment of the

evidence.  Moreover, even assuming an expert could have testified that Lunnin's participation in

the drug operation was less extensive than his co-defendants, it does not follow that the jury

would have acquitted Lunnin on Count One or found him responsible for a lesser quantity of

narcotics.  The Court instructed the jury that the Government had the burden of proving all

elements of the conspiracy charged in Count One, including that the overall scope of the

conspiracy involved at least 500 grams of methamphetamine and 68 kilograms of marijuana.[161]

The Court further instructed the jury that:

---

[158]*Lunnin,* 608 F. App'x at 653–56, 659–61.

[159]*Id.* at 664.

[160]Doc. 276 at 28.

[161]Doc. 171, Instr. 12.

If you are convinced the charged conspiracy existed, then you must next determine whether the defendant was a member of that conspiracy, that is, whether the defendant knew at least the essential goals of the conspiracy and voluntarily chose to be a part of it. The law does not require proof that the defendant knew all the other members of the conspiracy or knew all the details about how activities were to be carried out. A person may belong to a conspiracy for a brief time or play a minor role.[162]

Thus, Lunnin cannot meet his burden to establish counsel's failure to call a drug expert fell below an objective standard of reasonableness, and his claim fails.

## J. Jury Instructions

Lunnin claims Lowry was ineffective for failing to request this Court instruct the jury on 1) multiple conspiracies; 2) a lesser-included offense; and 3) an affirmative defense to witness tampering. He further claims that Lowry was ineffective for failing to object to an erroneous witness tampering instruction. The Court addressed these arguments in turn.

### 1. Multiple Conspiracies

Lunnin challenges the sufficiency of the evidence on Count One, and argues that had Lowry requested a multiple conspiracy instruction, no reasonable juror could have found him guilty of the conspiracy charge. This claim fails because a multiple conspiracy instruction was not supported by the evidence.

When reviewing a challenge to jury instructions, the court "consider[s] the instructions given as a whole to determine whether the instructions adequately state the law and provide the jury with an ample understanding of the issues and controlling principles of law."[163] "A multiple conspiracy instruction should 'instruct[ ] the jury to acquit if it finds that the defendant was not a member of the indicted conspiracy but rather was involved in another conspiracy."[164] The Tenth

---

[162]*Id.*

[163]*United States v. Edwards,* 69 F.3d 419, 433 (10th Cir. 1995) (citation omitted).

[164]*Id.*

Circuit does not require a multiple conspiracy instruction as long as the instructions inform the jury that "the government had the burden of proving beyond a reasonable doubt the [single] conspiracy as alleged, and that the evidence should be considered separately as to each defendant."[165]  In this case, the jury was so instructed.[166]

Further, as the Tenth Circuit's decision affirming Lunnin's conviction makes clear, the evidence was sufficient to prove each element of the charged conspiracy, including interdependence.[167]  Based on the evidence presented at trial as well as this Court's instructions, Lowry's performance did not fall below an objective standard of reasonableness

### 2.  Lesser-Included Offense

Lunnin claims that Lowry was ineffective because he failed to request "a lesser-included offense instruction, e.g., aiding and abetting."[168]  The Tenth Circuit applies a four-part test in determining whether a lesser-included-offense instruction should be given: (1) the defendant must make a proper request, (2) the elements of the lesser included offense must be a subset of the elements of the charge offense, (3) the element required for the greater, charged offense, which is not an element of the lesser offense, must be in dispute, and (4) the evidence must be

---

[165]*United States v. Evans,* 970 F.2d 663, 675 (10th Cir. 1992) (internal quotation marks omitted).

[166]The Court gave the following pertinent instructions:

[T]he evidence must show that the members of the alleged conspiracy came to a mutual understanding to try to accomplish a common and unlawful plan . . . proof is not sufficient if it merely shows that the defendant knew about the existence of the conspiracy or was associated with members of the conspiracy.

The defendant is on trial only for the acts alleged in the Indictment.  He is not on trial for any other acts or conduct.  In determining whether the defendant is guilty or not guilty, you are therefore to consider only whether the defendant has or has not committed the acts charged in this Indictment. Even if you are of the opinion that he is guilty of some offense not charged in the Indictment, you must find the defendant not guilty if the evidence does not show beyond a reasonable doubt that the defendant committed the specific acts charged in the Indictment.

Doc. 171, Instr. 12, 20.

[167]*United States v. Lunnin,* 608 F. App'x 649, 656 (10th Cir. 2015).

[168]Doc. 276 at 33.

such that the jury could rationally acquit the defendant of the greater offense and convict him of the lesser offense.[169]  To the extent Lunnin argues that Lowry should have requested an instruction on the lesser-included offense of "aiding and abetting" the distribution of narcotics, or the possession with intent to distribute narcotics, the Tenth Circuit has held that "possession, possession with intent to distribute, and distribution are not lesser included offenses of conspiracy to commit these same offenses."[170]

Further, to the extent Lunnin argues that Lowry should have requested an aiding and abetting instruction on the conspiracy count, he mistakenly characterizes such a charge as a lesser-included offense.  18 U.S.C. § 2 states that "Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."  In other words, this law makes it a crime to intentionally help someone else commit a crime.  The Government did not charge Lunnin with a violation of 18 U.S.C. § 2, and thus Lowry's failure to request an aid and abet instruction was not deficient.

Finally, to the extent Lunnin argues that the lesser-included offense of the conspiracy count could have been the same charge, but with no marijuana quantity and a lower quantity of methamphetamine, there could be no prejudice because the special interrogatories in the verdict form asked the jurors to make drug-quantity findings specific to Lunnin.[171]  The drug quantities charged in Count One set the statutory maximum penalties, as they were the drug quantities attributable to the conspiracy as a whole.[172]  The verdict form, however, asked the jury to find, beyond a reasonable doubt, whether Lunnin, as opposed to the overall conspiracy, had conspired

---

[169]*United States v. Bruce,* 458 F.3d 1157, 1162 (10th Cir. 2006), *cert. denied,* 127 S. Ct. 999 (2007).

[170]*United States v. Horn,* 946 F.2d 738, 744 (10th Cir. 1991).

[171]Doc. 172.

[172]*See United States v. Stiger,* 413 F.3d 1185, 1192 (10th Cir. 2005) ("[I]n the conspiracy context, a finding of drug amounts for the conspiracy as a whole sets the maximum sentence that each coconspirator could be given.").

to distribute "500 grams or more" of methamphetamine, or instead, "a quantity of less than 500 grams, but 50 grams or more" of methamphetamine. This drug-quantity finding was required before a mandatory minimum sentence could be imposed pursuant to 21 U.S.C. § 841.[173] Had the jury answered "No" to both questions, no mandatory minimum penalty would have applied to Lunnin.[174]

Accordingly, Lunnin cannot establish either prong under *Strickland*, and his claim on this ground is denied.

### 3. Affirmative Defense

Lunnin claims that Lowry was ineffective for failing to request an affirmative defense to witness tampering instruction pursuant to 18 U.S.C. § 1512(e), which provides:

> In a prosecution for an offense under this section, it is an affirmative defense, as to which the defendant has the burden of proof by a preponderance of the evidence, that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully.

"A defendant is not entitled to an instruction which lacks a reasonable legal and factual basis."[175] In determining whether there is sufficient evidence to warrant a jury instruction, the testimony is viewed in the light most favorable to the defendant.[176]

Viewing the trial testimony in the light most favorable to Lunnin, there existed no legal or factual basis to support the affirmative defense instruction. Hinderliter testified that when Lunnin saw him at the SRS office, he said, "You fucking pussy, you're the feds and you're going to die," "I'll kill you," and "Watch, watch, watch."[177] Hinderliter's account was corroborated by

---

[173]*See Alleyne v. United States*, 133 S. Ct. 2151, 2162 (2013).

[174]*See* 21 U.S.C. § 841(b)(1)(C).

[175]*United States v. Al-Rekabi,* 454 F.3d 1113, 1121 (10th Cir. 2006).

[176]*Id.*

[177]Trial Tr. at 212.

Bobbi Moore, who was in the waiting room.[178]  Even assuming Lunnin's account that the

encounter only lasted seconds and that he spoke in a low, non-threatening voice, it is not

evidence that Lunnin encouraged Hinderliter to testify truthfully.  Thus, this claim of ineffective

counsel fails.

### 4.  Witness Tampering

Lunnin claims that this Court's witness tampering instructions were erroneous.  In

support, Lunnin cites *Elonis v. United States*,[179] where the Supreme Court held that the crime of

transmitting in interstate commerce any threatening communication, in violation of 18 U.S.C.

§ 875(c), required proof that the defendant intended to issue threats or knew that the

communications would be viewed as threats, rejecting a reasonable person standard.[180]  Because

*Elonis* was decided approximately eighteen months after Lunnin's conviction at trial, he cannot

show that Lowry's failure to follow it was deficient.[181]  Moreover, as discussed in Section L.4,

*infra*, *Elonis* has no application to the witness tampering offense in this case.  Because the

witness tampering jury instruction in this case was not erroneous, this claim fails.[182]

### K.  Sentencing

### 1.  Relevant Conduct

Lunnin claims that Lowry provided ineffective assistance of counsel at sentencing

because he did not challenge the PSR's relevant conduct findings, which found Lunnin

responsible for 500 grams of methamphetamine and 50 kilograms of marijuana, the quantities the

---

[178]*Id.* at 67.

[179]135 S. Ct. 2001 (2015).

[180]*Id.* at 2011.

[181]*United States v. Harms,* 371 F.3d 1208, 1212 (10th Cir. 2004) ("The Sixth Amendment does not require counsel for a criminal defendant to be clairvoyant.").

[182]*See* Doc. 171, Instr. 13.

jury attributed to Lunnin in its special interrogatories.  Lunnin argues that he should only be accountable for 177 grams of methamphetamine and that Lowry failed to make that argument at sentencing.

Lowry objected to paragraph 37 of the PSR, which stated, in pertinent part: "According to Shawn Smith, Kyle gave Smith money on four occasions totaling $22,500 and in turn made a profit of $10,000."  Lowry did not, however, object to paragraph 61, which noted that Lunnin "was found guilty by a jury, [sic] of conspiring to distribute more than 500 grams of methamphetamine and 50 grams or more of marijuana," or to paragraph 70, which assigned him a base offense level of 32 based upon the jury's special findings of drug quantity.  Lowry also requested this Court to depart downward to a total offense level of 32, effectively conceding that the Court could not sentence him below the ten-year statutory minimum sentence that corresponded with the jury's special findings regarding the drug quantities.[183]  As the Tenth Circuit noted, Lunnin waived any challenge to this Court's drug-quantity findings.[184]

Nevertheless, Lunnin cannot meet his burden to establish prejudice under *Strickland*, which requires him to show that Lowry's deficiencies "actually had an adverse effect on the defense," as opposed to "some conceivable effect on the outcome of the proceeding."[185]  The Tenth Circuit went on to find that even if Lunnin had objected to this Court's drug-quantity findings at sentencing, "the jury's findings were adequately supported by the evidence presented

---

[183]*Lunnin,* 608 F. App'x at 664.

[184]*Id.*

[185]*Strickland,* 466 U.S. at 693.

at trial."[186]  Because the likelihood of a different result must be substantial, not just conceivable, Lunnin's claim fails.[187]

## 2. Materially Untrue Information

Lunnin claims that Lowry was ineffective for failing to challenge materially untrue information in the PSR, which this Court relied upon at sentencing.  This claim fails under both *Strickland* prongs.

Lunnin continues to challenge the drug quantity used to determine his base offense level and takes issue with this Court's alleged reliance on information in the PSR reporting that Lunnin invested $22,5000 with Shawn Smith to purchase methamphetamine.  Lunnin's argument is misplaced.  First, Lowry did in fact object to the information in paragraph 37 of the PSR and specifically challenged the $22,500 amount.[188]  Second, this Court did not rely on the $22,500 amount for relevant conduct purposes.[189]  Third, the Tenth Circuit found that the jury's defendant-specific drug quantity findings "were adequately supported by the evidence presented at trial."[190]  Therefore, Lunnin fails to meet his burden to show either constitutionally deficient performance by Lowry or prejudice.

Lunnin also claims Lowry's performance was deficient for failing to correct allegedly erroneous statements at sentencing, where this Court summarized the trial evidence, and that the Tenth Circuit then adopted these erroneous drug-quantity findings.  This claim is without merit because the Court's drug-quantity finding was based on paragraphs 60-62 of the PSR,

---

[186]*Lunnin,* 608 F. App'x at 664 (noting that jury heard about Lunnin's $5,000 investment, collecting money from Hinderliter on one occasion, and having assisted Smith and others in counting large sums of drug money).

[187]*Harrington v. Richter,* 562 U.S. 86, 112 (2011).

[188]Doc. 215, PSR ¶ 140.

[189]Doc. 253, Sent. Hrg. Tr. at 8 ("[T]he Court's sentence in terms of calculating relevant conduct is not based on $22,500.  So this dispute . . . doesn't actually direct the Guideline calculation for [defendant].").

[190]*Lunnin,* 608 F. App'x at 664.

Determination of Relevant Conduct, and not based upon its recollection that Lunnin gave Hinderliter an "8-ball of methamphetamine" and other statements concerning Lunnin's participation in the conspiracy.[191]

Even if Lunnin could establish Lowry was ineffective in not objecting to the relevant conduct findings, however, he cannot establish that he was prejudiced by the alleged error. As noted, the Tenth Circuit found that the jury's defendant-specific drug quantity findings "were adequately supported by the evidence presented at trial,"[192] and thus Lunnin's sentence was not based on "materially untrue statements."

Finally, the Court rejects Lunnin's claim that Lowry's cumulative errors warrant relief. Because Lunnin fails to establish that trial counsel committed two or more actual errors, there are no harmless errors to aggregate.[193]

**L. Appeal**

**1. Failure to Follow Court Rules**

Lunnin claims that his appellate counsel, Mr. Keleher, failed to provide parts of the record on appeal pursuant to Fed. R. App. P. 28(a)(8)(A), which prejudiced him because the Tenth Circuit could not properly consider his challenge of the admission of co-conspirator statements. As the Tenth Circuit noted, Lunnin failed to point to specific statements he believed were improperly admitted at trial, instead citing to general categories of testimony given by the four co-conspirators at the *James* hearing.[194] The court further noted that Lunnin's failure to cite

---

[191]Doc. 223 at 1 (adopting PSR without change); Doc. 253 at 14.

[192]*Lunnin,* 608 F. App'x at 664.

[193]*See Darks v. Mullin,* 327 F.3d 1001, 1018 (10th Cir. 2003).

[194]*Lunnin,* 608 F. App'x at 657.

to parts of the record on which he relies made it "impossible for us to determine precisely what testimony Lunnin is now objecting to."[195]

This omission, however, did not preclude the court from considering Lunnin's claim. The Tenth Circuit continued,

> In any event, having examined the record on appeal, we conclude that all of the evidence presented by the government at trial was relevant to show (a) how the conspiracy originated, (b) how it functioned, (c) that it continued even after Shawn Smith's arrest in early December 2012, or (d) Lunnin's specific involvement in the conspiracy.  Thus, we conclude the district court did not abuse its discretion in admitting this testimony or the recordings of Shawn Smith's conversations while in jail.[196]

Lunnin therefore cannot establish that he was prejudiced by this omission under *Strickland*, and this claim is denied.

### 2.  Defective Jury Instructions

Lunnin claims that appellate counsel was ineffective for failing to argue that this Court's jury instructions were flawed because they did not include instructions on multiple conspiracies, lesser-included offenses, and the affirmative defense under 18 U.S.C. § 1512(e).  Because trial counsel did not request these instructions, the Tenth Circuit would have applied plain error review to these claims.[197]  The Tenth Circuit finds plain error where there is "(1) error, (2) that is plain, (3) which affects substantial rights, and (4) which seriously affects the fairness, integrity, or public reputation of judicial proceedings.[198]  A defendant is not entitled to relief if he fails to

---

[195]*Id.* at 657–58.

[196]*Id.* at 658.

[197]Fed. R. Crim. P. 52(b); *United States v. Duran,* 133 F.3d 1324, 1330 (10th Cir. 1998).

[198]*United States v. McComb,* 519 F.3d 1049, 1054 (10th Cir. 2007).

establish on or more of the four elements of plain error.[199]  The plain error standard is "rigorous" and "difficult to overcome."[200]

For the reasons discussed in similar claims against trial counsel, *infra*, Lunnin cannot show that appellate counsel was "objectively unreasonable" for failing to assert these claims concerning the jury instructions on appeal, and if so, that there is a "reasonable probability that, but for his counsel's unreasonable failure" to raise these claims, Lunnin would have prevailed on his appeal.  As noted, the likelihood of a different result must be substantial, not just conceivable, and taking into account the rigorous standard of review on appeal, Lunnin's claim must fail.

### 3.  Failure to File for Rehearing Based on Obvious Errors

Lunnin takes issue with a litany of findings, or lack thereof, by the Tenth Circuit, and claims that there is a reasonable possibility that the outcome of the proceedings would have been different had appellate counsel moved to correct these alleged "clear errors" by filing a petition for rehearing.  Petitions for panel rehearing are permitted for issues "the court has overlooked or misapprehended."[201]  "A petition for rehearing should not be filed routinely.  Rehearing will be granted only if a significant issue has been overlooked or misconstrued by the court."[202] "[P]etitions for rehearing are permitted to enable parties to notify, and to correct, errors of fact or law on the issues already presented; they are not meant to permit parties to assert new grounds

---

[199]*United States v. McBride,* 633 F.3d 1229, 1231 (10th Cir. 2011) (citing *United States v. Romero,* 491 F.3d 1173, 1179 (10th Cir. 2007)).

[200]*United States v. Rosales-Miranda,* 755 F.3d 1253, 1258 (10th Cir. 2014).

[201]Fed. R. App. P. 40.

[202]10th Cir. R. 40.1.

for relief" or to shift their positions.[203]  Petitions for rehearing en banc are reserved for the "truly exceptional cases."[204]

Lunnin alleges the following errors by the Tenth Circuit: 1) not finding there were multiple conspiracies, because Shawn Smith was only involved with methamphetamine and his son Blaine was only involved with marijuana; 2) in describing Count One of the Indictment, omitting the language charging 68 kilograms of marijuana; 3) noting that prior to their encounter, Hinderliter's name had been disclosed to defense counsel as a possible government witness; 4) stating there was no evidence that Lunnin ever made or considered making any trips to Colorado; 5) finding that Hinderliter's testimony was corroborated by others; 6) ignoring Hinderliter's omission from the government's witness list; 7) relying on this Court's "misstatement" that others had seen Lunnin deliver large sums of money to Shawn Smith and that there was no support in the record for that finding; 8) finding reasonable that  Lunnin was responsible for 500 grams of methamphetamine and over 50 kilograms of marijuana; and 9) finding that Lunnin received a "harsher sentence" because he went to trial.

The Court finds there is no merit to Lunnin's claims of error, which are not supported by the record or evidence, immaterial or not prejudicial.  Because Lunnin cannot satisfy the requirements for panel or en banc rehearing, he cannot meet his burden under either *Strickland* prong, and his claims necessarily fail.[205]

---

[203]*United States v. Charley,* 189 F.3d 1251, 1264 n.16 (10th Cir. 1999).

[204]*Easley v. Reuss,* 532 F.3d 592, 594 (7th Cir. 2008) (citation omitted).

[205]*See Hooks,* 184 F.3d at 1221.

### 4. *Elonis v. United States*

Lunnin claims that appellate counsel was ineffective for failing to request an abeyance of the instant case on appeal pending the Supreme Court's decision in *Elonis v. United States*.[206] He further claims that appellate counsel was ineffective for failing to present the *Elonis* argument on direct appeal, or to move for rehearing based on the *Elonis* decision, which was issued three days after the Tenth Circuit issued its decision in *Lunnin*.

In *Elonis*, the Supreme Court analyzed the *mens rea* requirement for convictions under the threatening communications statute, 18 U.S.C. § 875(c), holding that the statute requires more than "proof that a reasonable person would regard [the] communications as threats.[207] The Court did not specify the *mens rea* required under that statute, but made clear that a simple negligence standard was unconstitutional.[208]

Unlike § 825(c), § 1512(a)(2)(A) expressly contains a *mens rea* requirement. That statute requires proof that the prohibited threat be made with the "intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding[.]"[209] This Court's jury instruction included § 1512(a)(2)(A)'s intent element and further stated,

> An act "with the intent to influence the testimony" of a person means to act for the purpose of getting the person to change, color, or shade his or her testimony in some way, but it is not necessary for the government to prove that the person's testimony was, in fact, changed in any way.[210]

Accordingly, *Elonis* has no application to the witness tampering offense in this case because § 1512(a)(2)(A) does not suffer from the same defect at issue before the Supreme

---

[206]135 S. Ct. 2001 (2015).

[207]*Id.* at 2012.

[208]*Id.* at 2012–13.

[209]18 U.S.C. § 1512(a)(2)(A).

[210]Doc. 171, Instr. 13.

Court.[211]  Because Lunnin cannot meet his burden to prove that appellate counsel was ineffective for failing to raise the *Elonis* issue on direct appeal or in a motion for rehearing.[212]  Lunnin's motion is denied on this claim.

### 5. True Threat

Finally, Lunnin claims that Keleher was deficient in failing to move for a rehearing on the basis that Lunnin's statements to Hinderliter were not "true threats."

 In reviewing the sufficiency of the evidence, the Tenth Circuit will "reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[213]  The Tenth Circuit rejected Lunnin's argument that he did not actually threaten Hinderliter, stating: "We have interpreted a 'threat' as a statement 'that a reasonable person in the circumstances would understand as a declaration of intention, purpose, design, goal, or determination to inflict bodily injury on another.'"[214]

The facts of this case support a finding that when Lunnin, who was under federal indictment at the time, said to Hinderliter, "You fucking pussy, you're the feds and you're going to die," "I'll kill you," and "Watch, watch, watch," he made a "true threat."  The Tenth Circuit considered that the encounter between Lunnin and Hinderliter was brief and that Lunnin did not raise his voice or make any threatening gestures, but concluded nevertheless that Lunnin's words

---

[211]*See United States v. Godwin-Painter,* 2015 WL 5838501, at *3 (S.D. Ga. Oct. 6, 2015) (distinguishing *Elonis* in prosecution for violating § 875(d) because "[u]nlike § 875(c), § 875(d) does require[ ] a specific intent to extort and, as a result, indictments tracking that section's statutory language do not suffer from the same failing" identified in *Elonis*); *United States v. Ulibarri,* No. CR 12-3182 JB, 2015 WL 4461294, at *21 (D.N.M. July 15, 2015) ("Unlike § 875(c), § 2J1.2(b)(1)(B) of the Sentencing Guidelines already contains a *mens rea* requirement. For § 2J1.2(b)(1)(B) to apply, the defendant must have acted *in order to* obstruct the administration of justice. Because § 2J1.2(b)(1)(B) already separates wrongful conduct from otherwise innocent conduct, an additional *mens rea* requirement is unnecessary.") (citing *Elonis;* internal quotation marks, citations, and alterations omitted; emphasis in original).

[212]*See Hooks v. Ward,* 184 F.3d 1206, 1221 (10th Cir. 1999) (explaining that if the omitted issue has no merit, counsel's failure to raise it does not constitute ineffective assistance of counsel).

[213]*Lunnin,* 608 F. App'x at 559 (internal quotation marks omitted).

[214]*Id.* at 660 (quoting *United States v. Heineman,* 767 F.3d 970, 972 (10th Cir. 2014)).

could be interpreted as a threat.[215]  Because this issue lacks merit, Lunnin cannot meet his burden

to show that appellate counsel was deficient in failing to raise it in a motion for rehearing.[216]

Likewise, Lunnin cannot show a substantial likelihood that, had appellate counsel filed for

rehearing on this issue, the Tenth Circuit would have granted the motion and reached a different

outcome.[217]  This claim is denied.

### M. Motion to Appoint Counsel

Lunnin seeks counsel to assist with his motion to vacate.  A defendant has no

constitutional or statutory right to appointment of counsel in the prosecution of a § 2255 motion

unless the court determines that an evidentiary hearing is required.[218]  In determining whether to

appoint counsel in a civil case, the court considers several factors, including (1) the merit of the

litigant's claims; (2) the nature of the factual issues raised in the claims; (3) the litigant's ability

to present his or her claims; and (4) the complexity of the claims involved.[219]  Applying these

factors, Lunnin is not entitled to counsel.  As explained above, Lunnin's claims lack substantive

merit.  Moreover, although numerous, his claims are not particularly complex factually or legally

and he is able to adequately present his claims.  Accordingly, the Court denies Lunnin's request

to appoint counsel.

---

[215]Id.

[216]*See Hooks,* 184 F.3d at 1221.

[217]Id.

[218]Rule 8(c) of the Rules Governing Section 2255 Proceedings; *see Pennsylvania v. Finley,* 481 U.S. 551, 555 (1987).

[219]*See Williams v. Meese,* 926 F.2d 994, 996 (10th Cir. 1991).

## IV. Certificate of Appealability

Under Rule 11 of the Rules Governing Section 2255 Proceedings, the court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.[220]  A certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right.[221]  To satisfy this standard, the movant must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[222]  For the reasons stated above, the Court finds that Lunnin has not satisfied this standard and therefore, denies a certificate of appealability as to its ruling on his § 2255 motion.

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Kyle Lunnin's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Doc. 272) is **denied** without evidentiary hearing; Lunnin is also denied a COA.

**IT IS FURTHER ORDERED** that Lunnin's Motion to Appoint Counsel (Doc. 287) is **denied.**

**IT IS SO ORDERED.**

Dated: November 1, 2017

                                                  S/ Julie A. Robinson
                                                  JULIE A. ROBINSON
                                                  UNITED STATES DISTRICT JUDGE

---

[220]The denial of a § 2255 motion is not appealable unless a circuit justice or a district judge issues a certificate of appealability.  Fed. R. App. P. 22(b)(1); 28 U.S.C. § 2253(c)(1).

[221]28 U.S.C. § 2253(c)(2).

[222]*Saiz v. Ortiz*, 392 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting *Tennard v. Dretke,* 542 U.S. 274, 282 (2004)).